Filed: 4/19/2022 9:34 AM
Lynne Finley
District Clerk
Collin County, Texas
By Rosanne Munoz Deputy
Envelope ID: 63675191

NO. _____ 471-01902-2022

| | | |
|---|---|---|
| **RAISING CANE'S RESTAURANTS, L.L.C.,** | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| **CROSSINGS AT HOBART-I, LLC** | § § § | COLLIN COUNTY TEXAS |
| and | § § | |
| **SCHOTTENSTEIN PROPERTY GROUP, INC.** | § § § § | |
| Defendants. | § | \_\_\_\_ JUDICIAL DISTRICT COURT |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Raising Cane's Restaurants, L.L.C. ("Raising Cane's") files this Original Petition (the "Petition") against Crossings at Hobart-I, LLC ("Crossings") and Schottenstein Property Group, Inc. ("SPG") (collectively "Defendants") and alleges as follows:

## NATURE OF THE ACTION

This case is about Defendants' scheme to induce Raising Cane's to enter a 15-year lease with rent payments to Crossings totaling millions of dollars, in exchange for a Raising Cane's restaurant that Defendants knew would never actually exist.

Raising Cane's is a national chain of quick-service restaurants that specializes in the sale of chicken fingers. Raising Cane's motto is "ONE LOVE" which succinctly captures its singular focus—serving customers "quality chicken finger meals" in the United States and abroad.[1] Consistent with that goal, in July 2021, Raising Cane's entered into a lease with Crossings (the

---

[1] *See* https://www.raisingcanes.com/our-concept.

Copy from re:SearchTX

"Lease") for the sole purpose of opening and operating a Raising Cane's restaurant at the Crossings at Hobart shopping center in Merrillville, Indiana (the "Shopping Center").

Unbeknownst to Raising Cane's, ***years before*** the Lease was negotiated and executed, another tenant, McDonald's USA, LLC ("McDonald's"), was given the exclusive right to sell chicken products at the Shopping Center.[2] Despite knowing that ***the entire business model of Raising Cane's Chicken Fingers® is premised on the sale of chicken fingers***, Defendants[3] did not disclose this issue before the Lease was executed. In fact, Defendants specifically represented to Raising Cane's that there was no exclusivity right that would conflict with Raising Cane's ability to operate its restaurant. Incredibly, Defendants did not tell Raising Cane's it would be unable to sell its chicken fingers at the Shopping Center until nearly eight months later ***after*** watching Raising Cane's spend nearly a year of time and over a million dollars to develop its new restaurant.

Defendants' fraud did not consist only of tacit silence and failure to disclose these material facts. Indeed, during negotiation of the Lease Defendants made numerous representations to Raising Cane's confirming that it ***could*** open and operate a Raising Cane's restaurant (i.e., sell chicken fingers) at the Shopping Center. Defendants even went so far as to purport to sell Raising Cane's the exclusive right to sell deboned chicken products at the Shopping Center—all while knowing McDonald's had already been sold that right.

Without Defendants' assurances, Raising Cane's never would have entered the Lease and never would have spent approximately a year and over a million dollars developing its new restaurant. Defendants undoubtably knew this but apparently did not care, as long as Raising

---

[2] Raising Cane's understanding of McDonald's exclusivity rights at the Shopping Center is based on post-lease representations by Defendants about McDonald's exclusive right to sell chicken products at the Shopping Center.

[3] Representatives of SPG, an affiliate of Crossings, negotiated the Lease on behalf of Crossings.

Cane's agreed to pay millions in future rental payments. Further, Defendants were incentivized to defraud Raising Canes so they could use Raising Cane's name in enticing *other* potential tenants to lease space at the Shopping Center.[4]

As a result of Defendants' misconduct, Raising Cane's has entered into a 15-year lease for a property that it cannot actually use, which has resulted in significant damages to Raising Cane's. These damages include over a million dollars in development costs, including costs incurred related to diligence, permitting, plans, demolition, prep, and construction work. They also include millions of dollars in lost profits that Raising Cane's will forego from not being able to open and operate a store at the Shopping Center. And they include the increased cost of rent that will likely result from Raising Cane's being required to pursue a different location to serve its Merrillville, Indiana customers. All of these losses could have been easily prevented had Defendants simply been forthright about McDonald's exclusivity rights. Thus, Raising Cane's is forced to bring this suit.

## PARTIES

1. Raising Cane's is a Louisiana limited liability company with its principal place of business and corporate headquarters in Collin County at 6800 Bishop Road, Plano Texas, 75024.

2. Crossings is a foreign limited liability company organized and existing under the laws of Delaware, whose principal place of business is located at 4300 E. 5th Ave., Columbus, Ohio 43219. Crossings may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service. While Crossings engages in

---

[4] For example, SPG's public marketing materials for the Shopping Center specifically lists Raising Cane's as a tenant. *See* http://spgroup.com/MarketingPkg.aspx?BLDGID=6110. Presumably, more specific marketing materials exist that contain additional representations, discussions, and characterizations of Raising Cane's, which Raising Cane's will seek in discovery.

business in Texas and this suit arises from that business, Crossings does not maintain a regular place of business in Texas or a designated agent for service of process.

3. SPG is a foreign corporation organized and existing under the laws of Ohio, whose principal place of business is located at 4300 E. 5th Ave., Columbus, Ohio 43219. SPG may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service. While SPG engages in business in Texas and this suit arises from that business, SPG but does not maintain a regular place of business in Texas or a designated agent for service of process.

## JURISDICTION & VENUE

4. Jurisdiction and venue are proper in this Court.

5. This Court has subject matter and personal jurisdiction over this matter.

6. The Court has subject-matter jurisdiction over this lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

7. The Court has personal jurisdiction over Crossings because Crossings has purposefully availed itself of the privilege and benefits of conducting business in this state by contracting directly with an entity whose principal place of business is in Plano, Texas. Further, the material misrepresentations and omissions at issue in this case were made by representatives of Crossings and directed to natural persons who are residents of Texas, located in Texas at the time such representations were made and employed by an entity that resides in Texas.

8. The Court has personal jurisdiction over SPG because SPG has purposefully availed itself of the privilege and benefits of conducting business in this state by negotiating a

contract directly with an entity whose principal place of business is in Plano, Texas, and by owning and operating a shopping center in McAllen, Texas.[5]

9. Further, the material misrepresentations and omissions at issue in this case were made by employees and/or representatives of SPG and directed to natural persons who are residents of Texas, located in Texas at the time such representations were made and employed by an entity that resides in Texas.

10. Similarly, both SPG and Crossings routinely contract with Texas-based counterparties as part of their commercial real-estate business. A perusal of SPG's website discloses that Crossings currently has negotiated leases with the following Texas-based entities:

- Mattress Firm;
- Men's Wearhouse;
- Michaels;
- GameStop;
- AT&T; and
- Chuck E. Cheeses.

11. Venue is proper in Collin County, Texas, pursuant to Texas Civil Practice & Remedies Code § 15.002(a)(4) because Raising Cane's resided in Plano, Texas, when this cause of action accrued, and no other subdivision of Texas Civil Practice & Remedies Code § 15.002(a) applies. Further, Defendants directed communications, including the material misrepresentations at issue in this case to an entity and its employees and agents located in Collin County, Texas.

---

[5] *See, e.g.*, http://spgroup.com/MarketingPkg.aspx?BLDGID=1616.

**FACTUAL BACKGROUND**

I. **Raising Cane's Enters the Lease Based on Defendants' Representations That It Could Open and Operate a Raising Cane's Restaurant at the Shopping Center.**

12. In early 2021, Raising Cane's began exploring the possibility of opening a Raising Cane's restaurant in Merrillville, Indiana.

13. Raising Cane's and Crossings began negotiating the Lease on or around March 16, 2021. Representatives of SPG, a national real estate company and affiliate of Crossings, negotiated the Lease on behalf of Crossings.

14. In late July 2021, Raising Cane's and Crossings executed the Lease, which provides for Raising Cane's use of certain property at the Shopping Center for a 15-year period in exchange for more than $2 million in rent over the life of the Lease. Ex. A.

15. At all times during negotiation of the Lease, Raising Cane's was clear about its intended use for the property—to open a new Raising Cane's restaurant and sell chicken finger meals at the Shopping Center.[6] For example, Raising Cane's specifically negotiated for the removal of certain restrictions on the leased property that would prevent it from constructing a drive-through lane, evidencing its intent to build a new Raising Cane's restaurant at the Shopping Center. While negotiating the Lease, Raising Cane's also sent Defendants multiple versions of a site plan that clearly depicted a Raising Cane's restaurant at the Shopping Center:

---

[6] This purpose was memorialized in Section 6 of the Lease. Ex. A § 6 ("Tenant shall use the Property only for the construction and operation of a free-standing quick-service restaurant . . . .").



16. Similarly, the Lease itself contains graphics, mock signage, and mock banners that all clearly evidence Raising Cane's intent to use the leased property to develop a new Raising Cane's restaurant. *See* Ex. A at Exhibit B.

17. Understanding Raising Cane's ability to sell chicken fingers was a threshold issue, Defendants made numerous representations to Raising Cane's that it could open and operate a restaurant (i.e., sell chicken fingers) at the Shopping Center. Indeed, Defendants went so far as to promise Raising Cane's that it had the ***exclusive*** right to sell deboned chicken products at the Shopping Center.

18. Without Defendants' assurance, Raising Cane's would never have entered into the Lease.

19. Consistent with this fundamental point, the Lease contains several key representations, warranties, and covenants related to Raising Cane's ability to use the property it has leased for its intended purpose. *See, e.g.*, Ex. A §§ 11, 14, 30. For example, in Section 14 of

the Lease, Crossings represented and warranted that it held "fee simple title" to the property at issue except for any "encumbrances and restrictions" listed on a certain title commitment. *Id.* Notably, McDonald's exclusive right to sell chicken at the Shopping Center was not included in that title commitment. In Section 14, Crossings also represents and warrants that it "will not cause or permit the Property to become subject to or encumbered by any covenants, conditions or restrictions of record, conflicts or exclusive uses which could in any manner adversely affect or interfere with Tenant's Use." *Id.* at § 14.

20. Notably, the Lease also contains a restrictive covenant which prevents Crossings from leasing or selling property in the Shopping Center to any other "fast good or quick service restaurant . . . which prepares, serves, or sells de-boned chicken products . . . ." *Id.* at § 14. Despite this restrictive covenant being a key negotiation point, Defendants never told Raising Cane's it had already given McDonald's the exclusive right to sell chicken products at the Shopping Center. In fact, Defendants specifically represented to Raising Cane's that there was no such provision that would conflict with Raising Cane's ability to operate its new restaurant.

## II. Defendants Were Aware of McDonald's Exclusivity Right Years Before Negotiation and Execution of the Lease.

21. It is undisputed that before the parties even began negotiating the Lease, Defendants were aware of McDonald's exclusivity rights at the Shopping Center.

22. According to Defendants, McDonald's exclusivity rights arise from an exclusive use provision in a lease agreement between BC Chicago, Inc. ("BC Chicago") and Jubilee Limited Partnership ("Jubilee"), which was executed in 1994. This exclusive use provision purports to grant "the exclusive right" to BC Chicago "to sell rotisserie chicken and other prepared chicken and chicken products for on or off-premises consumption" (the "Exclusive Use Provision"). Ex. B.

23. Defendants claim that McDonald's is a successor-in-interest to the Exclusive Use Provision and that Crossings is a successor-in-interest to Jubilee.[7] Ex. C.

### III. Raising Cane's Begins Construction, and Defendants Attempt to Cover Up Their Misconduct.

24. Defendants turned over the leased property to Raising Cane's on February 7, 2022. By this point, Raising Cane's had already invested significant time and money obtaining required permits and planning for construction of the new restaurant. As contemplated by the Lease, on February 14, 2022, Raising Cane's began construction-related activities at the Shopping Center to prepare the property for its new restaurant.[8] These activities included demolition of a building that was most recently used to operate a TGI Friday's. Raising Cane's planned to develop its new restaurant in the same location.

25. A little over a week after Raising Cane's started construction (but unbeknownst to Raising Cane's), Crossings sent a letter to McDonald's[9] seeking a waiver of the Exclusive Use Provision so that it could secure Chipotle Mexican Grill ("Chipotle") as a tenant in the Shopping Center. This letter made no mention of Raising Cane's.

26. On March 11, 2022, McDonald's sent a letter in response, unambiguously declining the waiver request. The letter further stated:

> [Y]ou have acknowledged that Landlord is currently leasing (or intends to lease) a location within the Shopping Center for a future proposed Raising Cane's Chicken Fingers. This would clearly violate the terms of the exclusive use provision. McDonald's demands that you ***immediately cease*** any such proposal to sell chicken

---

[7] It is unclear how and when McDonald's and Crossings took over BC Chicago and Jubilee's interests in the provision, and no publicly available documentation exists that would have put Raising Cane's on notice of this issue.

[8] SPG had even amended its website to reflect that Raising Cane's was going to open a restaurant at the Shopping Center.

[9] This letter was signed by Mark Ungar, Executive Vice President of Leasing and Development for SPG Group. Mr. Ungar also signed the lease between Crossings and Raising Cane's.

in the Shopping Center in violation of the Lease to prevent a default under the Lease.

Ex. D (emphasis in original). Despite McDonald's strong stance, ***Defendants said nothing to Raising Cane's***. Instead, Defendants stood on the sidelines as Raising Cane's continued to incur over a million dollars in development costs.

27. On March 16, 2022, Crossings sent McDonald's another letter with a new proposal: Crossings would agree to give McDonald's a "broader exclusive to cover McDonald's lease" and would agree to sell a parcel of land to McDonald's in exchange for an agreement to waive the Exclusive Use Provision for Raising Cane's and Chipotle. Again, Defendants said nothing to Raising Cane's about the Exclusive Use Provision or its negotiations with McDonald's.

28. McDonald's rejected this proposal by letter dated March 18, 2022, stating that it "strongly urge[d] [Crossings] to cease construction [of the Raising Cane's] to mitigate any further losses in relation to the proposed building and planned use that will violate the use restriction in the Lease."

IV. **Defendants Finally Come Clean but Refuse to Help Raising Cane's.**

29. On March 22, 2022, Defendants told Raising Cane's about the Exclusive Use Provision for the very first time—six weeks *after* turning the property over to Raising Cane's and *after* silently watching Raising Cane's spend significant capital demolishing a building to make space for a restaurant that Defendants knew would be implicated by the Exclusive Use Provision.

## CLAIMS

### COUNT I

**(Fraudulent Inducement – Crossings)**

30. Raising Cane's incorporates Paragraphs 1 through 29 of this Petition as if set forth fully herein.

31. Crossings made numerous representations to Raising Cane's while negotiating the Lease about Raising Cane's ability to open and operate a Raising Cane's location at the Shopping Center. Those representations were not true, Crossings knew they were not true when they were made, and Crossings intended for Raising Cane's to rely on the representations.

32. The representations were material, as they frustrate the very purpose of the Lease—Raising Cane's ability to sell chicken fingers at the Shopping Center. Critically, Raising Cane's relied on these representations in making its decision to enter into the Lease. As a result of Crossings's wrongful conduct, Raising Cane's is entitled to rescission of the Lease and the recovery of monetary damages, detailed further in.

## COUNT II

### (Fraud – Crossings and SPG)

33. Raising Cane's incorporates Paragraphs 1 through 32 of this Petition as if set forth fully herein.

34. Defendants made numerous misrepresentations to Raising Cane's over approximately a year related to its ability to open and operate a Raising Cane's restaurant at the Shopping Center. Those representations were not true, Defendants knew they were not true when they were made, and Defendants intended for Raising Cane's to rely on the representations.

35. The representations were material, as they related to Raising Cane's ability to sell its primary product (chicken fingers) at the Shopping Center. Critically, Raising Cane's relied on these representations in making its decision to open and operate a restaurant at the Shopping Center. As a result of Defendants' wrongful conduct, Raising Cane's suffered injury and is entitled to the recovery of monetary damages, as detailed further in.

Copy from re:SearchTX

## COUNT III

### (Fraud by Nondisclosure – Crossings & SPG)

36. Raising Cane's incorporates Paragraphs 1 through 35 of this Petition as if set forth fully herein

37. Defendants intentionally failed to disclose the existence of the Exclusive Use Provision to Raising Cane's, which was a material fact relevant to Raising Cane's decision to open a restaurant at the Shopping Center.

38. Defendants had a duty to disclose the existence of the Exclusive Use Provision, which arose from partial disclosures that Defendants made regarding Raising Cane's ability to open and operate a Raising Cane's restaurant, which created a false impression about Raising Cane's ability to sell chicken fingers at the Shopping Center.

39. Defendants also had a duty to disclose the existence of the Exclusive Use Provision arising from its voluntary disclosure of certain information related to Raising Cane's ability to open and operate a Raising Cane's restaurant, which created a duty to disclose the Exclusive Use Provision.

40. Raising Cane's was unaware of the Exclusive Use Provision until Defendants informed it about the provision in late March 2022. Raising Cane's did not have information available to it that would allow it to discover the relationship between BC Chicago and Jubilee on the one hand and Crossings and McDonald's on the other hand. Nor could it have anticipated the Exclusive Use Provision, which was executed more than 25 years ago between two entities no longer operating at the Shopping Center, would bar its ability to sell chicken fingers at the Shopping Center.

Copy from re:SearchTX

41. Defendants intended Raising Cane's to rely on its material omission, as it knew informing Raising Cane's of the Exclusive Use Provision would materially impact Raising Cane's decision to open and operate a Raising Cane's at the Shopping Center.

42. Raising Cane's relied on Defendants' material omissions in making its decision to open and operate a restaurant at the Shopping Center. As a result of Defendants' wrongful conduct, Raising Cane's suffered injury and is entitled to rescission of the Lease and/or the recovery of monetary damages, including but not limited to recovery of over a million dollars it has spent in development costs, as well as its lost profits.

## COUNT IV

### (Negligent Misrepresentation – Crossings & SPG)

43. Raising Cane's incorporates Paragraphs 1 through 42 of this Petition as if set forth fully herein.

44. Defendants made numerous false representations of facts to Raising Cane's over approximately a year related to its ability to open and operate a Raising Cane's restaurant at the Shopping Center.

45. It cannot be disputed that as successors in interest to Jubilee's, Crossings and its affiliate SPG were aware of the Exclusive Use Provision and were aware their representations were false at the time they were made. Thus, Defendants necessarily failed to exercise reasonable care.

46. Raising Cane's believed and justifiably relied upon Defendants' representations in making its decision to open a Raising Cane's restaurant at the Shopping Center.

47. As a result of Defendants' wrongful conduct, Raising Cane's suffered injury and is entitled to the recovery of monetary damages, including but not limited to recovery of more than a million dollars it has spent in development costs, as well as its lost profits.

## DAMAGES

48. Raising Cane's seeks the damages that have resulted from Defendants' wrongful conduct.

49. These damages include over a million dollars in development costs that Raising Cane's has spent to develop a restaurant at the Shopping Center.

50. Raising Cane's damages also include the millions of dollars in lost profits that Raising Cane's will forego from not being able to open and operate a restaurant at the Shopping Center.

51. And Raising Cane's damages include the increased cost of rent and any increased development costs that will likely result from Raising Cane's being required to pursue a different location to serve its Merrillville, Indiana customers.[10]

## EXEMPLARY DAMAGES

52. Because Defendants have defrauded Raising Cane's, Raising Cane's is entitled to exemplary damages under Texas law.

## CONDITIONS PRECEDENT

53. All conditions precedent to filing this lawsuit have been performed or have occurred.

## DISCOVERY CONTROL PLAN

54. Raising Cane's intends to conduct discovery under Level 3 of the Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-

---

[10] Given the current rate of inflation, Raising Cane's anticipates that the cost to build a store in the future could materially exceed the cost to build the restaurant at the Shopping Center. Any difference between those costs would constitute damages owed by Defendants.

Copy from re:SearchTX

actions process in Texas Rule of Civil Procedure 169 because Raising Cane's seeks monetary relief over $250,000.

## CLAIM FOR RELIEF

55. Raising Cane's seeks monetary relief over $1,000,000.

## JURY DEMAND

56. Raising Cane's hereby demands a trial by jury and will pay the required jury fee.

## PRAYER

Plaintiff Raising Cane's respectfully requests that this Court enter judgment in its favor and against Defendants Crossings and SPG as follows:

1. For rescission of the Lease;

2. For all monetary damages incurred as a result of Defendants' fraudulent inducement, fraud by nondisclosure, fraud, and negligent misrepresentations;

3. For exemplary damages;

4. For prejudgment and post-judgment interest at the highest rate permitted by law; and

5. For any and all other such relief as this Court may deem just and appropriate.

Copy from re:SearchTX

Dated: April 18, 2022

NORTON ROSE FULBRIGHT US LLP

By: */s/ Rafe A. Schaefer*
    Rafe A. Schaefer
    Texas Bar No. 24077700
    rafe.schaefer@nortonrosefulbright.com
    Kate Ergenbright
    Texas Bar No. 24097660
    kate.ergenbright@nortonrosefulbright.com
    Timothy Shinn
    Texas Bar No. 24125409
    timothy.shinn@nortonrosefulbright.com
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:   (713) 651-5151
Facsimile:    (713) 651-5246

    James Jefferson 'Jay' Dewald
    Texas Bar No. 24001990
    jay.dewald@nortonrosefulbright.com
2200 Ross Ave #3600
Dallas, TX 75201

*Attorneys for Plaintiff Raising Cane's Restaurants, L.L.C.*

Copy from re:SearchTX