# EXHIBIT B

Copy from re:SearchTX

Location: _____

Store No. _____

## GROUND LEASE

THIS GROUND LEASE ("Lease") dated ▇▇▇▇▇▇▇▇▇ U B I L E E   L I M I T E D PARTNERSHIP, a(n) Ohio limited partnership ("Landlord") and B. C. CHICAGO, INC., a(n) Illinois corporation ("Tenant:").

1. FUNDAMENTAL TERMS AND ATTACHMENTS.

   (a) Fundamental-Terms. The f&lowing is a summary schedule of certain fundamental terms of this Lease.

   (i) Landlord: Jubilee Limited Partnership, an Ohio Limited Partnership

   Address: 1800 Moler Road
   Columbus, Ohio 43207
   Attn: Law Department

   (ii) Tenant: B. C. Chicago, Inc.

   Address: 1801 N. Mill Street, Suite R
   Naperville, IL 60563

   (iii) Address of Property: 1939 East 80th Avenue, Hobart, IN

   (iv) Intentionally Deleted.

   (v) Square Footage of Property: approximately ▇▇▇▇ square feet.

   (vi) Effective Date: The date that both Tenant and Landlord have signed this Lease as set forth on the signature pages and Tenant has received a fully executed counterpart of the Lease from Landlord.

   (vii) Rent

   | Lease Year | Annual Rent | Monthly Rent |
   |---|---|---|
   | 1-5 | $55,000.00 | $4,583.33 |
   | 6-10 | $60,500.00 | $5,041.67 |

Copy from re:SearchTX

if any, prior to Tenant's commencement of construction or reconstruction of the building on the Property, Tenant may terminate this Lease and the parties shall be released from further liability.

9. **RESTRICTIVE COVENANT.** As a material inducement for Tenant to enter into this Lease, Landlord acknowledges and agrees that during the Term and any Extension no portion of the Shopping Center (other than the Property) shall be sold, leased, managed, used or occupied for the Exclusive Use as defined in Section 5 of the Addendum to this Lease except as specifically provided in said Section 5. This restrictive covenant shall be set forth in the Memorandum of Lease to be recorded pursuant to Section 3 of this Lease. In the event of a breach by Landlord under the terms of this Section, Tenant shall be entitled to injunctive relief as well as all other remedies available at law or in equity, Landlord acknowledging and agreeing that Tenant does not have an adequate remedy at law for breach of this provision.

10. **REAL ESTATE TAXES.** Landlord shall pay all real estate taxes and assessments lawfully imposed on the Shopping Center ("Real Estate Taxes") during the Term and any Extensions. Landlord agrees to pay or cause to be paid when due all Real Estate Taxes with respect to tax parcels which affect both the Property and the balance of the Shopping Center. Tenant agrees to pay a share of the Real Estate Taxes so paid by Landlord (including reasonable costs incurred by Landlord to contest such Real Estate Taxes provided that Tenant's pro rata share of savings resulting from such contest exceeds its pro rata share of the costs incurred in obtaining same) calculated by multiplying the Real Estate Taxes by a fraction, with a numerator equal to the square footage of floor area of the building constructed on the Property and with a denominator equal to the leasable square footage of the larger tax parcel (or if the Shopping Center consists of more than one tax parcel, the cumulative leasable square footage of all tax parcels but excluding any tax parcels not paid by Landlord). Tenant shall pay its share of the Real Estate Taxes for such year annually within thirty (30) days of receipt of a copy of the actual tax bill(s) for said year and Landlord's calculation of the amount due by Tenant. Tenant shall have the right to audit Landlord's books and records relating to Real Estate Taxes and calculation of Tenant's share thereof upon ten (10) days prior written notice to Landlord. Nothing herein contained shall require Tenant to pay (a) corporation, franchise, income, estate, gift and inheritance taxes or other similar taxes, charges or impositions which may be levied or assessed against Landlord, any fee owner, or their successor in title, or (b) Real Estate Taxes on easement parcel(s), or (c) any late fees or penalties resulting from Landlord's failure to timely pay or cause to be paid any Real Estate Taxes. Real Estate Taxes shall be prorated on a per diem basis for any partial tax years falling within the Term or any Extensions.

Tenant shall have the right, but not any obligation, to seek, at its own cost and expense, a division of the Property from the larger tax parcel(s). In the event of a division of the Property from the larger tax parcels, Real Estate Taxes payable by Tenant directly to the taxing authority shall be paid prior to the date on which such Real Estate Taxes become delinquent. A receipted tax bill shall be delivered to Landlord upon written request. In the event any Real Estate Taxes for Tenant's separate tax parcel may be payable in installments, Tenant may pay them as the installments become due, provided that Tenant receives a copy of the relevant tax bill at least twenty (20) days before the due date. Further, Tenant shall have the right, at its own cost and expense, to initiate and prosecute any proceedings permitted by law for the purpose of obtaining an abatement of or otherwise contesting the validity or amount of Real Estate Taxes assessed or levied upon the Property and the building and/or other improvements constructed on the Property. If required by law, Tenant may take such action in the name of Landlord who shall cooperate with Tenant to the extent reasonably required by Tenant. In lieu of the pro rata share of taxes to be paid by Tenant to Landlord in the immediately preceding paragraph, if Tenant creates a separate tax parcel for the Property, then Tenant shall only be liable to Landlord for its pro rata share (based on the same formula set forth in the preceding paragraph) applicable to only the common areas of the Shopping Center.

*4Brfi,,*

In the event that Tenant ceases the operation of business upon the Property, other than for reasons of force majeure, casualty and/or taking by exercise of eminent domain, then at Landlord's sole option, while Tenant's operations are so ceased, may deliver written notice of its intent to terminate the Lease and recapture the Property in the event of Tenant's failure to reopen the Property for business within one hundred fi (l80)tfE consecutive days following the date of delivery of Landlord's notice. If Tenant fails to reopen within said day period, Landlord P§tilderminate the Lease by delivery of written notice of its election to do same following the expiration of said        ay period and the Lease, Tenant's right to possession of the Property, and Tenant's obligation to pay Rent and any other sums payable by Tenant hereunder shall automatically expire as of the date of termination set forth in Landlord's written notice, which shall be no more than 60 days following the date of said notice.   Additionally, in the event that Landlord does noJne,i<:ercise its right to terminate this Lease upon Tenant's failure to reopen following the expiration of said ffl   day period, Tenant's Exclusive Use provided for in Section 5 of the Addendum hereto and the Restrictive Covenant provided in Section 9 of this Lease shall toll until such time as Tenant reopens for business and any leases entered into by Landlord permitting the tenant(s) thereunder to operate in violation of the Exclusive Use (following the expiration of the aforesaid day period only) shall be valid and not deemed to be in violation of the aforesaid Sections of this Lease. 180

35.    **COLLATERAL ASSIGNMENT OF LEASE.** Concurrently with the execution of this Lease, Tenant shall collaterally assign the Lease to Franchisor.   Landlord hereby consents to the collateral assignment of this Lease to Franchisor and to any entity which is a party to a potential merger or consolidation with or to the acquisition of substantially all of the assets or stock of Tenant or Franchisor and to a further collateral assignment or hypothecation by Franchisor of the interest so assigned by Tenant, all in accordance with that certain Collateral Assignment of Lease attached hereto as Exhibit "F" (the "Collateral Assignment"). If requested by Tenant, Landlord agrees promptly to execute any reasonable documents evidencing Landlord's consent to such assignment or assignments. The execution and delivery of such Collateral Assignment by and between Franchisor and Tenant shall be a condition precedent to Tenant's obligations under this Lease; which condition precedent shall be deemed to have been satisfied or waived by Tenant unless Tenant gives Landlord written notice to the contrary within thirty (30) days following the Effective Date.

36.    **LANDLORD'S CONSENT TO COLLATERAL ASSIGNMENTS.** In order to preserve Franchisor's rights in connection with Landlord's consent to the Collateral Assignment, Landlord agrees to all of the following:

(a)    to notify Franchisor in writing of and upon the failure of Tenant to cure any default by Tenant under the Lease;

(b)    that Franchisor shall have the right, but shall not be obligated, to cure any default by Tenant under the Lease within thirty (30) days after delivery by Landlord of notice thereof in accordance with Section (a) above;

(c)    that Landlord agrees that if Franchisor shall take possession of the Property and confirm to Landlord the assumption of the Lease by Franchisor as tenant thereunder, Landlord shall recognize Franchisor as the tenant under the Lease, provided that Franchisor cures any default by Tenant under the Lease within the thirty (30) day cure period noted above, except that if Franchisor is diligently pursuing curing such default and cannot do so within the thirty (30) day cure period, then Franchisor shall have a reasonable extension of time to cure the default; and

(d)    that Franchisor: (i) shall have the absolute right to assign, sublet or otherwise transfer its right, title, estate and interest in the Lease and all its proprietary interest arising therefrom to any

Copy from re:SearchTX

operate the Dish. The Dish is anu shall remain the property of Tenant or Tenant's assignee, transferee or sublessee, and Landlord and Tenant agree that the Dish is not, and installation of the Dish at the Property shall not cause the Dish to become, a fixture pursuant to the Lease or by operation of law. Tenant shall be responsible for the repair and maintenance of the Dish during the term of this Lease, at its sole cost and expense, and upon the termination of this Lease shall remove said Dish and repair any and all damage to the Property (including but not limited to the roof of the Property) caused as a result of such removal. The plans and specifications for the Dish, and its size and location, are subject to the approval of Landlord, not to be unreasonably withheld.

42.    **ADDENDUM(S).**   This Lease contains the following Addendum(s) which are attached hereto and made a part of this Lease: Ground Lease Shopping Center Addendum.

IN **WIrrS** WHEREOF, Landlord has caused this Lease to be executed and sealed this /: day of          1    1-    1994.

**WITNESSES:**

                              **LANDLORD:**

                              JUBILEE LIMITED PARTNERSHIP, an Ohio limited partnership

*Nicole A. Feliciano*

*Cathleen M. Powell*

                              By:  Schottenstein Professional Asset Management Corporation, a Delaware corporation

                              By: _____
                              Name:   Jay Schottenstein
                              Title:   Chairman

**IN SS** WHEREOF, Tenant has caused this Lease to be executed and sealed this ___ day of ___ - :c..1 , 1994.

**WITNESSES:**

                              **TENANT:**

                              B.C. CHICAGO, INC., an Illinois corporation

*Kimberly Beila*

                              By: _____
                              Name: _____
                              Title: _____

## GROUND LEASE
## SHOPPING CENTER ADDENDUM

**THIS ADDENDUM** to that certain Ground Lease ("Lease") dated the ____ day of --orr-c-' 1994, between JUBILEE LIMITED PARTNERSHIP ("Landlord") and B. C. CHICAGO, INC. ("Tenant"). In the event of a conflict between the terms of this Addendum and this Lease, the terms of this Addendum shall control. Defined terms in this Lease shall have the same meaning in this Addendum.

1. **Shopping Center.** With regard to the Shopping Center shown on the Site Plan which is adjacent to and contiguous with the Property (the "Shopping Center"), Landlord covenants and agrees as follows:

   a. Tenant and its customers and invitees shall at no cost to Tenant have reasonable ingress to and egress from and across and parking on the Common Areas of the Shopping Center for the use and benefit of the Property, including any Improvements;

   b. Landlord shall at all times maintain the Shopping Center, including the common areas identified in Section 2 below, in good repair and in safe and clean condition and comply with all lawful requirements of all laws, ordinances, rules and regulations of all governmental authorities in regard to the Shopping Center. Tenant shall pay per year an amount (the "Common Area Charge") equal to the product of $0.75 multiplied by the total square footage of floor area of the building located on the Property in equal monthly installments of one-twelfth of said Common Area Charge, at the same time per month as payment is due for Rent, as Tenant's contribution to Landlord's costs of maintenance and repair of the exterior common areas of the Shopping Center, which amount shall be increased by fifteen percent (15%) upon the commencement of the sixth (6th) Lease Year and the commencement of each of the Extension Terms.

   c. No Build/No Change Areas. Tenant has entered into this Lease in reliance on the Landlord's development and maintenance of the Shopping Center as depicted on Exhibit "G" hereof. Tenant will be substantially harmed if certain aspects of the Shopping Center are changed, whether by reconfiguration, construction of improvements, or otherwise, in the areas of the Shopping Center identified as the "No Build/No Change Areas" on Exhibit "G". Therefore, Landlord covenants and agrees that no changes shall be made to said "No Build/No Change Areas" which affect the visibility of, or access to, the Property without Tenant's prior written consent which may be withheld in Tenant's sole discretion.

   d. Landlord shall continue lighting the Access Network, Restricted Area and parking lot of the Shopping Center at least one and one-half hours after closing of Tenant's business on the Property; and

   e. Landlord shall, at no additional cost to Tenant all times maintain public liability insurance covering the common areas of the Shopping Center. Upon notice from Tenant, Landlord shall deliver to Tenant a certificate from Landlord's insurer declaring such insurance to be in full force and effect. Landlord and Tenant hereby release and waive any claim or right of recovery against the other for any loss resulting from insurable causes arising out of or in connection with the Shopping Center or the Property; and

   f. Landlord acknowledges that the existence of the Access Network (herein so defined) as depicted on Exhibit G to this Lease is critical to the operation and success of the Property. Accordingly, Landlord covenants, at its sole cost and expense, to maintain a cross easement agreement with the owner of the real property on which all or a portion of the Access Network is located so that Tenant and its customers and invitees shall be provided continuous, free access to and from the Property to the right of way known as U.S. Highway 30 throughout the Term and all Extensions thereof. Landlord shall not consent to any mendment

JNO1381 04/05/94 1142

Copy from re:SearchTX

or modification of such cross easement agreement affecting any of the Access Network, No Build/No Changes Areas, Restricted Area or the Property without Tenant's prior written consent thereto, which consent may be withheld in Tenant's sole discretion if the proposed change in any way alters direct access from the Property to said public right of way through the Access Network or Tenant's beneficial rights pursuant to any recorded easement agreement set forth on Schedule B of Tenant's Title.

2. **Common Areas.** The common areas shall include the parking lot, lighting facilities, driveways, landscaping, sidewalks and any other facilities located in the Shopping Center which are available for the joint use of all the tenants in the Shopping Center and the Property, their employees, agents, customers, licensees and invitees. Landlord shall have the right from time to time to modify the common areas of the Shopping Center but any such modifications thereto shall be in accordance with, and subject to, the terms and conditions of this Lease.

3. **Easements.** Tenant shall have the right to the non-exclusive use of the common areas of the Shopping Center for parking, non-exclusive ingress and egress to, over and from the Shopping Center for pedestrian and vehicular passage (and Landlord shall not be permitted to construct any barriers, including curbing within the areas of the Shopping Center referred to herein as the Access Network, the No Build/No Change Area and the Restricted Areas or between such areas and the Property) between the common areas of the Shopping Center and the Property and any necessary temporary construction easement which may be necessary for construction upon the Property. Landlord covenants to enforce the aforesaid easement and rights of Tenant at Landlord's cost and expense, and covenants not to allow any diminution thereof without obtaining Tenant's prior consent, which consent shall not be unreasonably withheld unless such amendment adversely affects Tenant's use and enjoyment of the Property in any way.

4. **Restrictions on Use.** Tenant has entered into this Lease in reliance upon the retail character of the Shopping Center, and Landlord agrees as follows: (i) that no part of the Shopping Center located within the portion of the Shopping Center identified on Exhibit "G" as the Restricted Areas (herein so defined) shall be sold, used or leased to parking intensive users (collectively "Restricted Uses"), which shall include, but not be limited to, a theater, auditorium, meeting hall, school or other place of public assembly, gymnasium, medical facility or health club; and (ii) that no part of same shall be sold, used or leased for noxious uses, which shall include, but not be limited to, a bar, off-track betting business, billiard or pool hall; for bingo or similar games of chance, or, as a massage parlor, bowling alley, skating rink, car wash, car repair or car rental agency, night club or adult book or adult video tape store (which are defined as stores in which any portion of the inventory is not available for inventory explicitly deals with or depicts human sexuality). No restaurant that has seating and waiter/waitress table service shall be permitted in the Shopping Center within two hundred fifty (250) feet in any direction from the boundary lines of the Property.

5. **EXCLUSIVE.** Landlord covenants and agrees that during the Term and any Extensions, if exercised, so long as the Property is used as a restaurant whose use includes the sale of prepared chicken and chicken products, and subject only to the exceptions specifically set forth in this Addendum, Section 5, Tenant shall have the exclusive right in the Shopping Center to sell rotisserie chicken and other prepared chicken and chicken products for on or off-premises consumption (the "Exclusive Use"). This covenant shall run with the land on which the Shopping Center is located. Notwithstanding the foregoing, in the event Landlord leases any portion of the Shopping Center for use as a restaurant, the lease for such restaurant may permit the use to include the sale of chicken (other than rotisserie chicken which may not be offered for sale or sold in such restaurant) and chicken products for on-premises and off-premises consumption so long as the sale of such chicken items does not constitute the primary or a predominant menu item (as may be determined by such restaurant's gross sales generated from the sale of such chicken items, the number or variety of other items offered on the menu, or such other factors as may be reasonable determinants of this standard); and further

provided, tha, ... u1e event of the lease to a restaurant consisting of more than 6,000 square feet of floor area, the lease for such restaurant may provide for the sale of rotisserie chicken to the extent, and only so long as, the sale of same does not exceed five percent (5%) of such tenant's gross sales generated from said restaurant location per annum. Landlord agrees to enforce the agreements contained in this Section against tenants in the Shopping Center using all reasonable legal means. In the event of a breach by Landlord under this Section, Tenant shall be entitled to injunctive relief as well as all other remedies available at law or at equity, Landlord acknowledging and agreeing that Tenant does not have an adequate remedy at law for breach of this provision.

IN :!!f-SS WHEREOF, Landlord has cau.sed the Addendum to be executed and sealed this day of iA. , 1994.

**WITNESSES:**

**LANDLORD:**

JUBILEE LIMITED PARTNERSHIP, an Ohio limited partnership

By: Schottenstein Professional Asset Management Corporation, a Delaware corporation

_Nicole L. Feliciano_

_ltl;tt.¥ /IJ./2)/11_

By: _[signature]_
Name: Jay Schottenstein
Title: Chairman

IN SS _____ WHEREOF, Tenant has caused the Addendum to be executed and sealed this ,L.il ay of_ / , 1994.

**WITNESSES:**

_m/./'-/lv Bala_

**TENANT:**

B.C. CHICAGO INC.,
an Illinois corporation

By: _[signature]_
Name: John Monuck
Title: President

```
                                        STATE OF INDIANA
                                        LAKE COUNTY
                                        FILED FOR RECORD

    2010 018541                2010 MAR 31  AM 9:24      Prepared by Timothy Slattery
Hobart, Indiana                                          and recording return to: Marilyn Lawler
1938 E. 80th Ave.                                        McDonald's Corporation
L/C: 013-1136                                            One McDonald's Plaza
File #43878                            MICHELLE B. FAJMAN    Oak Brook, Illinois 60523
                                            RECORDER
```

82252c cm        **SUPPLEMENT TO LEASE**

This agreement is dated December 9, 2009 (the "Agreement") and supplements the Ground Lease dated July 11, 1994, as amended by Ground Lease Shopping Center Addendum dated July 11, 1994, Amendment of Lease dated May 26, 2000, Second Amendment to Ground Lease dated January 29, 2003, and Third Amendment of Lease dated April 23, 2009 (collectively, the "Lease") between **CROSSINGS AT HOBART-I, LLC, an Ohio limited liability company** ("Landlord"), whose address is 1800 Moler Road, Columbus, Ohio 43207, and **McDONALD'S USA, LLC, a Delaware limited liability company** ("Tenant") whose address is One McDonald's Plaza, Oak Brook, Illinois 60523, for the premises described on Exhibit A.

Pursuant to the terms and conditions contained in the Lease, this Agreement is executed to affirm the following facts:

1. The commencement date of the term of the Lease is April 23, 2009.

2. The Rent Adjustment Date is September 1, 2009.

3. The date upon which the original term of the Lease will expire is August 20, 2029.

The Lease, as supplemented by this Agreement, is ratified and confirmed by Landlord and Tenant.

LANDLORD:                                    TENANT:
**CROSSINGS AT HOBART-I, LLC,**              **McDONALD'S USA, LLC,**
an Ohio limited liability company            a Delaware limited liability company

By: _____                  By: _____
Its:   Jay L. Schottenstein, Chairman        Its:   Catherine A. Griffin
                                                    Vice-President
ATTEST:                                      ATTEST:
By: _____                  By: _____
Its:   Irvin A. Bain, Secretary              Its:   Padric Molloy
                                                    Senior Counsel
WITNESS:                                     WITNESS:

_____                      _____
Lindsay H. Hodge

_____                      _____
                                             Teresa Cool
                                                              **FILED**
                                                          MAR 31 2010

                                                        PEGGY HOLINGA KATONA
(Attach all Acknowledgment Certificates and Exhibit A)  LAKE COUNTY AUDITOR

                    **CTIC Has made an accomodation**       051718
Document #: 757378-v1  **recording of the instrument.**
                    Chicago Title Insurance Company

*(Left margin: CHICAGO TITLE INSURANCE COMPANY)*

**McDonald's USA, LLC**
(Attestation required)

STATE OF ILLINOIS ) 
) §
COUNTY OF DuPAGE )

I, Marilyn B. Lawler, a Notary Public in and for the county and state aforesaid, DO HEREBY CERTIFY that **Catherine A. Griffin, Vice President** and **Padraic Molloy, Senior Counsel**, of McDonald's USA, LLC, a Delaware Limited Liability corporation, which resides at One McDonald's Plaza, Oak Brook, Illinois 60523 and who are personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such **Catherine A. Griffin and Padraic Molloy**, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument at their free and voluntary act as **Vice President and Senior Counsel** and as the free and voluntary act of said corporation for the uses and purposes therein set forth.

Given under my hand and notarial seal, this 18th day of December, 2009.

OFFICIAL SEAL
MARILYN B LAWLER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/16/10

_Marilyn B. Lawler_
Marilyn B. Lawler, Notary Public

My commission expires:   August 16, 2010

**ACKNOWLEDGEMENT**

STATE OF  Ohio
COUNTY OF  Franklin  ) §

I, Rebecca A Rhoades, a Notary Public in, and for the county and state aforesaid, DO HEREBY CERTIFY that Jay Schottenstein, Chairman of Crossing at Hobart - 114 n Ohio LLC who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____ appeared before me this day in person and acknowledged that he/she signed, sealed and delivered the said instrument as his/her free and voluntary act as _____ and as the free and voluntary act of said company for the uses and purposes therein set forth.

Given under my hand and notarial seal, this 18th day of Feb., 2010.

_Rebecca A. Rhoades_
Notary Public

My commission expires: _____

REBECCA A. RHOADES
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES AUG. 8, 2012

Plaintiff's Original Petition - Page 101

LEGAL DESCRIPTION:

PART OF THE NORTH HALF OF SECTION 23, TOWNSHIP 35 NORTH, RANGE 8 WEST OF THE SECOND PRINCIPAL MERIDIAN, IN LAKE COUNTY, INDIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID SECTION 23; THENCE SOUTH 02 DEGREES 42 MINUTES 00 SECONDS EAST, ALONG THE WEST LINE OF SAID SECTION 23, 842.20 FEET TO THE SOUTHERLY RIGHT OF WAY LINE OF THE CHESAPEAKE AND OHIO RAILROAD; THENCE SOUTH 62 DEGREES 42 MINUTES 00 SECONDS EAST, ALONG SAID SOUTHERLY RIGHT OF WAY LINE, 1,614.41 FEET TO THE NORTHWESTERLY LINE OF TOYS "R" US PARCEL; THENCE SOUTH 27 DEGREES 18 MINUTES 00 SECONDS WEST ALONG SAID NORTHWESTERLY LINE, 628.33 FEET TO THE SOUTHERLY LINE OF TOYS "R" US PARCEL; THENCE CONTINUING SOUTH 27 DEGREES 18 MINUTES 00 SECONDS WEST, 164.53 FEET TO A POINT ON THE NORTH LINE OF A PARCEL OF LAND DESCRIBED AS PARCEL 1 IN AN ASSIGNMENT OF LEASE BETWEEN BOSTON MARKET CORPORATION AND McDONALD'S USA LLC, RECORDED AS DOCUMENT NUMBER 2007-084291 ON OCTOBER 23, 2007, IN THE OFFICE OF THE RECORDER OF LAKE COUNTY, INDIANA, SAID POINT BEING NORTH 88 DEGREES 35 MINUTES 39 SECONDS EAST, 33.01 FEET EAST (AS MEASURED ALONG SAID NORTH LINE) OF THE NORTHWEST CORNER OF SAID PARCEL 1; THENCE NORTH 88 DEGREES 35 MINUTES 39 SECONDS EAST, 38.08 FEET ALONG SAID NORTH LINE; THENCE SOUTH 01 DEGREES 22 MINUTES 12 SECONDS EAST, 23.35 FEET TO THE POINT OF BEGINNING; THENCE NORTH 88 DEGREES 37 MINUTES 48 SECONDS EAST, 99.25 FEET; THENCE SOUTH 01 DEGREES 22 MINUTES 12 SECONDS EAST, 53.00 FEET; THENCE SOUTH 88 DEGREES 37 MINUTES 48 SECONDS WEST, 99.25 FEET; THENCE NORTH 01 DEGREES 22 MINUTES 12 SECONDS WEST, 53.00 FEET TO THE POINT OF BEGINNING, CONTAINING 5,260 SQUARE FEET (0.12 ACRES) MORE OR LESS.

Copy from re:SearchTX